UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LUCAS NEREO, ARMANDO IZALDE, and
DANIEL MONTACHANA,

                              Plaintiffs,

                  -against-

SHLEPPERS HOLDINGS, LLC d/b/a
SHLEPPERS MOVING & STORAGE,
UNIVERSAL MOVING LLC, and ERNESTO
DEL VALLE individually,

                              Defendants.

---

22-CV-9505 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Plaintiffs, workers in the residential and commercial moving business, bring this action for

unpaid wages and other violations under the Fair Labor Standards Act and the New York State Labor

Law. Defendant Universal Moving, LLC, ("Universal") has defaulted by failing to appear in this

action, thereby admitting employer status and liability for Plaintiffs' claims. Plaintiffs and Defendant

Shleppers Holdings, LLC, ("Shleppers") now each move for summary judgment against the other,

with Shleppers asserting that it cannot be held liable for employment claims because it was not

Plaintiffs' employer. The Court concludes that there are genuine issues of material fact that preclude

a finding that Shleppers and defaulting defendant Universal are joint employers of Plaintiffs.

Accordingly, Plaintiffs' motion for summary judgment is DENIED, except that the Court finds that

Plaintiffs' employer, or employers, are liable for unpaid wages as a matter of law. Defendants' motion

for summary judgment is DENIED. The Court reserves judgment on the wage notice and statements

claims, pending further briefing on whether Plaintiffs have standing to assert these claims.

## BACKGROUND

### I.    Factual Background

Defendant Shleppers Holding, LLC ("Shleppers") is a corporation engaged in the residential and commercial moving business. ECF No. 79 ("Plaintiff's Statement of Material Facts" or "PSMF") ¶ 1; ECF No. 81 ("Defendant's Statement of Material Facts" or "DSMF") ¶ 1. Shleppers operates by retaining clients for whom they complete local, national, or global moves. *See* ECF No. 84-1 at 4. Shleppers regularly assigned moving jobs to both in-house workers and about ten outside company teams. ECF No. 91 ("Joint Statement of Material Facts" or "SMF") ¶¶ 3, 4. Shleppers' CEO, Raz Itzhaki, has stated that the use of outside teams provides Shleppers "more flexibility to run [Shleppers'] operation" than if the company only hired workers in-house. *Id.* ¶¶ 2, 5; ECF No. 77-3 ("Itzhaki Dep. 2") at 30:21–31:8. One such outside team was Defendant Universal Moving, LLC ("Universal"), which is solely owned by Ernesto Del Valle. SMF ¶ 3; ECF No. 77-1 ("Agreement") at 1.

In 2019, Shleppers and Universal entered into an independent contractor and subcontractor agreement through which Universal's employees acted as movers for Shleppers. SMF ¶¶ 1, 3, 4; ECF No. Agreement at 1–2. The Agreement constituted a "non-exclusive relationship such that [Shleppers] may utilize other subcontractors to perform Moving Services, or hire employees to perform Moving Services . . . ." Agreement at 2. The Agreement additionally stated that "[Universal] is expressly not restricted from providing its services to other parties, and in fact, is hereby encouraged to do so." *Id.*

Under the terms of the Agreement, Shleppers was to provide Universal with documents that specified the locations of the move and the approximate number of items to be moved. Agreement at 1. Universal was to "furnish the truck, equipment, material, labor; supervision; insurance . . . ; workers' compensation insurance; unemployment insurance, disability benefits, any applicable taxes, and any other requirements necessary" to perform moving services in accordance with the

Agreement's terms. *Id.* Shleppers required Universal to make them a certificate holder on Universal's workers' compensation insurance policy. SMF ¶ 20. Shleppers also required Universal to carry additional insurance for cargo and to name Shleppers as an additional insured party on its automobile policies. *Id.* ¶ 21. During moves, Universal was required to use boxes with Shleppers' logo, and Universal's employees were to wear Shleppers' uniforms. Agreement at 2. Universal employees must abide by Shleppers' working guidelines, including, *inter alia*, timeliness, refraining from using abusive language, and refraining from discussing tips with customers. *Id.* at 3. If customers requested tip information, Universal employees were to direct the customer to Shleppers' dispatch office. *Id.* Universal was to be responsible for claims and complaints submitted by Shleppers' clients. *Id.* at 1–2.

When working with subcontractors such as Universal, it was Shleppers' practice to create a Bill of Lading for the client, which belonged to Shleppers. SMF ¶ 6. Shleppers then provided the Bill of Lading to the subcontractor to complete the move. *Id.* ¶ 7. These Bills of Lading contained all the information needed to complete the move, including where to go, the name of the customer, items included as a part of the move, general time frames, and other details. *Id.* ¶ 8; *see generally* ECF No. 77-4. Subcontractors would be required to take Shleppers' Bill of Lading to the customer for signature and credit card authorization. SMF ¶ 9. Subcontractors had no authority to alter the Bill of Lading or agreements between Shleppers and customers. *Id.* ¶ 10.

On the day of a move, Shleppers sent quality assurance personnel to go on moves at random to check if customers were satisfied. *Id.* ¶ 11. If issues arose during the move, subcontractors were expected to report the issue to Shleppers' dispatch office. *Id.* ¶¶ 12–14. If subcontractors could not resolve the problem, customers were directed to contact a Shleppers dispatch employee to address the problem. *Id.* Shleppers' dispatch team ultimately oversaw all moves, handled issues that arose, directed additional services or changes to the move, and communicated with customers for each move. *Id.* ¶ 17; No. 77-2 ("Itzhaki Dep. 1") at 63:4–65:11. Shleppers' CEO has testified that the goal of the dispatch team is "to make sure the job is being done seamlessly" regardless of "who is doing

that." Itzhaki Dep. 2 at 62:4–9. As a result, regardless of whether the individuals carrying out the move are Shleppers' in house employees or employees of a subcontractor, the operation of the move is coordinated in the same manner. Itzhaki Dep. 1 at 76:11–20. Moreover, to ensure performance levels are adequate, Shleppers communicates with the owner of the independent contractor about problems. *Id.* at 66:25–68:12. If a subcontractor fails to perform, Shleppers stops doing business with them. *Id.* at 67:13–18. Shleppers' CEO has testified that he has "no way to know" about the details of a subcontractor's business management, and that he "only care[s] in the performance." *Id.* at 68:14–22.

Shleppers' accounting department handles all payments from customers, excluding tips. SMF ¶ 18. Under the terms of the subcontractor agreement, Shleppers was then to pay the subcontractor 44% of the amount collected from the customer. Agreement at 2. If there is damage to any item during the move, Shleppers has the right to unilaterally determine whether to compensate the customer. SMF ¶ 19. If the customer must be reimbursed, then costs are passed onto the subcontractor, who must reimburse Shleppers for at least 50%, and up to 100% of any payout by Shleppers to the customer. SMF ¶ 19; Agreement at 2. Universal would then make deductions from Universal employees' pay for purported incidentals, at least sometimes without providing evidence to employees about Shleppers' decisions. ECF No. 80-9 ("Nereo Dep.") at 57:7–24. Shleppers did not involve themselves with determining how much Universal's individual employees were paid. Itzhaki Dep. 2 at 73:24–74:2.

Plaintiffs Lucas Nereo, Armando Izalde, and Daniel Montachana were employees of Ernesto Del Valle, Universal's sole owner. Nereo Dep. at 24:23–25:6; ECF No. 80-10 ("Montachana Dep.") at 19:22–20:4; ECF No. 80-11 ("Izalde Dep.") at 23:19–25:16. Plaintiffs worked together on a team to complete moving jobs. Montachana Dep. at 21:6–9. Plaintiffs Montachana and Izalde testified that, when performing a job for Ernesto, they exclusively completed jobs serving Shleppers' customers, and that Ernesto only did work for Shleppers. Montachana Dep. 42:2–4; Izalde Dep. at

4

55:8–10. For each job, Plaintiffs worked on a truck to load, transport, and unload items before returning the truck for drop-off. Nereo Dep. at 33:4–36:25. Shleppers supervisors would occasionally provide Plaintiffs with Shleppers materials such as tape, boxes, and blankets. *Id.* at 61:5–21; 62:17–24. Shleppers supervisors would also check in on how Plaintiffs were packing items and, if necessary, direct Plaintiffs to correct arrangements. Montachana Dep. at 42:9–21.

During his employment with Del Valle, Plaintiff Izalde worked four to six days a week on average, for 17 to 19 hours per day. ECF No. 77-10 ("Izalde Aff.") ¶¶ 4–5, 9. Plaintiff Nereo worked an average of five days a week, 17 to 19 hours per day. ECF No. 77-11 ("Nereo Aff.") ¶¶ 4, 5. Plaintiff Montachana worked an average of five days per week, 17 to 19 hours per day. ECF No. 77-12 ("Montachana Aff.") ¶ 15. Plaintiffs were often required to arrive for work at 7:00 a.m. and would not finish work until 2:00 a.m. Izalde Aff. ¶¶ 3, 4; Nereo Aff. ¶¶ 3, 4; Montachana Aff. ¶¶ 3, 4. De Valle paid each Plaintiff an average of $70 to $90 per day. Izalde Aff. ¶ 15; Nereo Aff. ¶ 15; Montachana Aff. ¶ 15. Plaintiffs were not compensated for time spent waiting at the loading site, traveling to the pickup location, and returning to the office. Izalde Aff. ¶ 7; Nereo Aff. ¶ 7; Montachana Aff. ¶ 7. Neither Universal nor Shleppers kept records of hours worked by any Plaintiff. Izalde Aff. ¶ 9; Nereo Aff. ¶ 9; Montachana Aff. ¶ 9.

## II.    Procedural History

On November 7, 2022, Plaintiffs filed this action against Shleppers, Universal, and Ernesto Del Valle in his individual capacity for unpaid wages and inadequate wage notices and statements, asserting claims under the Fair Labor Standards Act ("FLSA") and the New York State Labor Law ("NYLL"). ECF No. 1. On April 7, 2023, the Court dismissed claims against Del Valle without prejudice for failure to prosecute. ECF No. 30. Due to Universal's failure to respond to the Complaint and to respond to an order to show cause why default judgment should not be entered against it, on June 23, 2023, the Court also determined that Plaintiffs are entitled to default judgment against Universal. ECF Nos. 35, 42.

On June 26, 2024, Plaintiffs filed a motion for summary judgment against Shleppers. ECF Nos. 76, 77, 78 ("P. Mot."). Shleppers then filed a cross-motion for summary judgment, contending that it was not an employer of Plaintiffs. ECF No. 80, 80-13 ("D. Mot."). The parties filed timely opposition briefs and replies. ECF No. 85 ("P. Opp."); ECF No. 86 ("D. Opp."); ECF No. 89 ("D. Rep."); ECF No. 90 ("P. Rep.").

## LEGAL STANDARD

In considering cross-motions for summary judgment, a court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Jingrong v. Chinese Anti-Cult World All. Inc.,* 16 F.4th 47, 56 (2d Cir. 2021) (citing *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)). To prevail on a motion for summary judgment, a movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 322. When the movant properly supports her motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)).

## DISCUSSION

Shleppers' liability under the FLSA and NYLL turns on whether Shleppers may be considered an employer of the Plaintiffs, which the Court examines in the first section of this discussion. After concluding that there are genuine issues of material fact as to Shleppers' status as an employer, the Court next determines that Plaintiffs were not paid adequate wages as a matter of law. Finally, the Court requires Plaintiffs to brief on why NYLL wage notice and wage statements claims should not be dismissed for lack of standing.

## I.    Genuine Issues of Fact Remain Regarding Shleppers' Employment Status

Claims under the FLSA and NYLL may only be brought against employers. 29 U.S.C. § 216(b); N.Y. LABOR LAW § 663(1) (McKinney 2025). Universal, through its default, has admitted that it is an employer of Plaintiffs under the FLSA and NYLL. *See* ECF No. 42; *S.E.C. v. Razmilovic*, 738 F.3d 14, 19 (2d Cir. 2013) (observing that a "complaint's well-pleaded allegations" as to defaulting defendant are deemed admitted for purposes of liability). Plaintiffs now seek to hold Shleppers liable under the FLSA and NYLL as a joint employer with Universal, or, in the alternative, as an entity operating with Universal in a single integrated enterprise.

As an initial matter, the Court sets forth the applicable standards for establishing employer status under the FLSA and the NYLL. Under the FLSA, the verb "employ" is expansively defined to mean "suffer or permit to work." 29 U.S.C. § 203(g); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992). This definition is interpreted with "striking breadth" and is grounded in "economic reality rather than technical concepts." *See Irizarry v. Catsimatidis*, 722 F.3d 99, 103–04 (2d Cir. 2013) (cleaned up) (citing *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008)).

The NYLL's definition of "employer" is similarly broad, focused on the "degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Suriel v. Cruz*, No. 20-CV-8442 (VSB) (SLC), 2022 WL 1750232, at *10 (S.D.N.Y. Jan. 10,

2022), *report and recommendation adopted*, No. 20-CV-8442 (VSB), 2022 WL 1751163 (S.D.N.Y. May 31, 2022) (internal citations and quotation marks omitted). "The statutory standard for employer status under the NYLL is nearly identical to that of the FLSA." *Hart v. Rick's Cabaret Int'l, Inc*., 967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013). Indeed, "there appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)." *Id.* at 924. As such, "courts in this District regularly apply the same tests to determine whether entities were joint employers under NYLL and the FLSA." *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 422 (S.D.N.Y. 2017) (collecting cases).

In a situation involving two nominally separate entities, a plaintiff can establish that both entities are his employers through either a joint employer theory or a single enterprise theory. *See Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 131–34 (S.D.N.Y. 2020); *see also Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005) (explaining that a joint employer relationship assumes the legal separation of the entities that jointly handle employer-employee relationships, whereas the single enterprise situation exists when "two nominally separate entities are actually part of a single integrated enterprise") (cleaned up). The joint employer theory is intended to allow broad coverage, including for "parties who might not qualify as such under a strict applicable of traditional agency law principles." *See Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 121 (S.D.N.Y. 2011) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992). A single integrated enterprise approach, however, only "applies in extraordinary circumstances" and is measured by its own distinct test. *See Benzinger*, 447 F. Supp. 3d at 133–34.

In the following discussion, the Court first examines Shleppers' employer status under a joint employer theory. Next, the Court considers whether Shleppers can be held liable under a single integrated enterprise theory. As the Second Circuit has recognized, the determination of joint employer status is rarely appropriate to make at the summary judgment stage because of its fact-intensive nature. *Barfield*, 537 F.3d at 143–44; *see also Zheng v. Liberty Apparel Co. Inc*., 355 F.3d

8

61, 76 n.13 (2d Cir. 2003). Consistent with this articulation, the Court concludes that while Shleppers and Universal do not form a single integrated enterprise as a matter of law, genuine issues of material fact remain regarding whether Shleppers qualifies as a joint employer.

### A. Joint Employment

"The regulations promulgated under the FLSA expressly recognize that a worker may be employed by more than one entity at the same time." *Zheng*, 355 F.3d at 66. "[E]ven when one entity exerts 'ultimate' control over a worker, that does not preclude a finding that another entity exerts sufficient control to qualify as a joint employer under the FLSA." *Barfield*, 537 F.3d at 148. The qualification of a joint employer is grounded in the "economic reality rather than technical concepts." *Id.* at 141 (citing *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). Courts have determined that the purpose of the economic reality test—"to expose outsourcing relationships that lack a substantial economic purpose"—may be met by a focus on "whether the alleged employer possessed the power to control the workers in question." *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 121 (S.D.N.Y. 2011) (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)).

Control in this context is "a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Id.* at 122 (citing *Barfield*, 537 F.3d at 141–42).  Thus, a plaintiff may prove employer status through showing that the joint employer exercises "formal control" over him, or through showing that the joint employer exercises "functional control" over him. *Barfield,* 537 F.3d at 143 (citing *Zheng*, 355 F.3d at 72). The Court examines formal and functional control of Shleppers over Plaintiffs in turn.

### 1. Formal Control

In *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984), the Second Circuit identified four factors used to determined when an entity exercises "formal control" over a worker sufficient to establish employer status. These factors are: "whether the alleged employer (1) had the

power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of pay; and (4) maintained employment records." *Id.* at 12 (internal citation omitted). No one factor standing alone is dispositive, and though these *Carter* factors "can be *sufficient* to establish employer status," they are not necessary. *Jean-Louis*, 838 F. Supp. 2d at 122 (citing *Herman*, 172 F.3d at 139 and *Zheng*, 355 F.3d at 71).

### i.  Hiring and Firing

The first factor, hiring and firing, weighs against a finding of formal control. The parties do not dispute that Shleppers had no direct role in the hiring or firing of Plaintiffs. P. Mot. at 12. Instead, each Plaintiff's testimony indicates that their hiring was through Ernesto Del Valle, the owner of Universal. *See* Nereo Dep. at 25:4–15; Montachana Dep. at 21:10–14; Izalde Dep. at 23:19–22. There is no evidence that Shleppers, at any time, directed Universal to hire particular individuals or that they participated in the hiring and screening process. Neither is there evidence that Shleppers was involved with the firing of Plaintiffs.

Plaintiffs instead contend that Shleppers' hiring and firing power derived from their ability to terminate Plaintiffs' team if they did not comply with Shleppers' policies. Shleppers indisputably retained the power to terminate their contract with Universal and therefore any engagement with Universal's employees. *See* Agreement at 4. Shleppers also apprised Universal's owner of any problems regarding employee performance that needed correction and would terminate subcontracts in the event that deficiencies were not corrected. Itzhaki Dep. 1 at 67:19–68:13. But Shleppers' CEO testified that he does not engage in or care about what the owners of subcontractors do in response to his complaints, as long as performance was adequate. *Id.* at 68:14–22. Thus, even if Shleppers' "economic leverage might have led [Universal] to conclude that it could not afford the risk of any action short of firing a problematic [employee]," absent evidence "that [Universal] terminated any

employee about which [Shleppers] specifically complained," this factor is not met. *Jean Louis*, 838 F. Supp. 2d at 125.

### ii. Work Schedules and Conditions

The second *Carter* factor is whether Shleppers supervised and controlled work schedules or conditions of employment. It appears that Shleppers exercised, at minimum, substantial influence on Plaintiffs' work schedules and conditions. Two of the Plaintiffs testified that they exclusively worked Shleppers' moves. Montachana Dep. 42:2–4; Izalde Dep. at 55:8–10. For each job, it was Shleppers' practice to specify the time frame for the job and the labor involved in the job through a Bill of Lading. SMF ¶¶ 6–8. Universal had no authority to alter the job requirements in (or any aspect of) the Bill of Lading. *Id.* ¶ 10. Shleppers also set conduct guidelines governing what Plaintiffs could say and how they could act. Agreement at 3. Moreover, any additional services or changes to the job were directed by Shleppers' dispatch team. *Id.* ¶ 17; Itzhaki Dep. 1 at 63:4–65:11.

Although these facts suggest a high degree of control over these conditions, they are not dispositive of whether Shleppers is a joint employer. Indeed, the Second Circuit has cautioned that "the degree to which the defendants supervise the plaintiffs' work . . . can be misinterpreted to encompass run-of-the-mill subcontracting relationships." *Zheng*, 355 F.3d at 74. At least one case has recognized that when the subcontractor ultimately controls whether and when an employee will work a particular assignment, the contractor may not exercise sufficient control over employees' work schedules to meet this formal control factor. *Jean Louis*, 838 F. Supp. 2d at 126. However, here, at least two Plaintiffs worked exclusively Shleppers' jobs, and for each of those jobs, Universal had little, if any, influence over the conditions. The record is unclear about whether Universal ever exercised power to remove Plaintiffs from Shleppers' jobs or otherwise intervened in Shleppers' control over Plaintiffs' schedule and conditions. The fact that Universal "may have exercised 'ultimate' authority'" in Plaintiffs' assignment on Shleppers' jobs "does not alter the fact that

[Shleppers] also exercised some authority which helps establish the economic reality of its status as a joint employer." *Barfield*, 537 F.3d at 144. As such, this factor weighs in Plaintiffs' favor.

### iii.   Rate of Pay

The third factor, control over Plaintiffs' rate and method of pay, also leans in Plaintiffs' favor. Shleppers does not have direct control of pay rates. PMSJ at 13. However, Shleppers controls the amount Universal received for each job—typically, 44% of the payment collected from the customer, subject to reductions for damages and costs. SMF ¶¶ 18–19; Agreement at 2. Plaintiffs have affirmed that they were compensated 18% of Universal's payout for jobs. Izalde Aff. ¶ 6; Montachana Aff. ¶ 6; Nereo Aff. ¶ 6. As a result, at least for the Plaintiffs who worked Shleppers jobs exclusively, Shleppers effectively determined their rates of pay.

That said, Shleppers did not actually involve themselves with determining how much Universal's individual employees were paid. Itzhaki Dep. 2 at 73:24–74:2. It also appears from Shleppers' CEO's testimony that Shleppers was unaware of any minimum wage policies for Plaintiffs. *See id.* In the event that a customer provides a cash tip, Shleppers claims to not know about it; if the tip is added to a credit card, Shleppers passes it on to the subcontractor and does not dictate what the subcontractor will do with it. *Id.* at 69:12–19. In other words, it appears that the entity responsible for the 18% rate of distribution among Plaintiffs was Universal, not Shleppers. For that reason, this factor only leans slightly in favor of Plaintiffs.

### iv.   Employment Records

Neither Universal nor Shleppers maintained employment records for Plaintiffs. Izalde Aff. ¶ 9; Nereo Aff. ¶ 9; Montachana Aff. ¶ 9. Shleppers, however, maintains employment records for its own employees. Itzhaki Dep. 2 at 75:3–76:7. This factor weighs against formal control.

In conclusion, two *Carter* factors suggest no formal control, while two *Carter* factors weigh in favor of employer status. This divided result does not support summary judgment for either party.

## 2.  Functional Control

Because the *Carter* analysis is not sufficient to determine the joint employer question, a court must examine functional control. *Barfield*, 547 F.3d at 143. The consideration of functional control is meant to "give[] content to the broad 'suffer or permit' language" of the FLSA, and also to "ensure[] that [FLSA] is not interpreted to subsume typical outsourcing relationships." *Zheng*, 355 F.3d at 75–76. Under *Zheng v. Liberty Apparel Co.*, the six "nonexclusive and overlapping" factors of functional control are: "(1) whether [the defendant's] premises and equipment were used for the plaintiffs' work; (2) whether the [plaintiffs were part of] a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [defendant's process]; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which [defendant] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the defendant]." *Zheng*, 355 F.3d at 72, 75 (2d Cir. 2003) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 724–25 (1947)).

### i.  Premises and Equipment

The premises and equipment factor is considered because it may "support the inference that a putative joint employer has functional control over the plaintiffs' work." *Zheng*, 355 F.3d at 72. Here, this factor leans ambiguously in favor Plaintiffs. Although Universal was required to "furnish the truck, equipment, [and] material" for all moving jobs, Universal's employees were required to use boxes with Shleppers' logo and wear Shleppers' uniforms. Agreement at 1–2. Plaintiffs also testified that Shleppers supervisors would occasionally provide Plaintiffs with Shleppers materials such as tape, boxes, and blankets. Nereo Dep. at 61:5–21; 62:17–24. However, it is unclear whether Plaintiffs predominantly relied on Universal for supplies or on Shleppers, and as far as premises are concerned, Plaintiffs drove Universal vehicles. Agreement at 1; Itzhaki Dep. 1 at 55:19–25. The Court is unconvinced that the amount of Shleppers' equipment used by Plaintiff amounts to a strong showing

of control over Plaintiffs' work, but determines that a reasonable jury may find that it is evidence of at least some control.

### ii.  Whether the Contractor Shifts as a Unit

The second *Zheng* factor is relevant "because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client." *Zheng*, 355 F.3d at 72. The inquiry is not just whether the contractor did, in fact, shift between employers, but whether they could have done so. *See id.*; *see also Jean-Louis*, 838 F. Supp. 2d at 132.  Here, the record lacks clear evidence that Universal exclusively worked for Shleppers, although the fact that two Plaintiffs testified to exclusively working Shleppers jobs suggests this may have been the case. Montachana Dep. 42:2–4; Izalde Dep. at 55:8–10. As to the question of whether Universal *could* have contracted its employees moving services another company, the record is equally unclear. The Court considers this factor inconclusive.

### iii.  Discrete Line-Job

The third factor, the extent to which Plaintiffs performed discrete line-jobs integral to Shleppers' process, should not be interpreted broadly. *Zheng*, 355 F.3d at 73 (warning that otherwise, this factor "could be said to be implicated in every subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service"). This factor derives from the example that workers in the de-boning operation at a slaughterhouse should be considered joint employees because they performed "a specialty job" integral to the production line, and accordingly, the Second Circuit has narrowly construed this factor to apply to work that occupies a special status in production processes. *Id.*

Here, the relevance of this factor is limited. Plaintiffs no doubt perform integral labor—their moving services form the heart of Shleppers' business. But theirs is not a special status line-job that is part of a production line. Plaintiffs are instead "engaged in providing a service rather than

14

manufacturing a product," and accordingly, this factor should "apply with somewhat less vigor." *Jean-Louis*, 838 F. Supp. 2d at 138.

### iv.   Fungibility

The fourth factor concerns whether "responsibility under the contracts could pass from one subcontractor to another without material changes." *Zheng*, 355 F.3d at 74. This factor weighs in favor of a joint employment determination when employees are tied to the defendant entity, rather than an ostensible direct employer. *Id.* Here, this factor weighs in favor of Shleppers: it appears that Plaintiffs perform work for Shleppers "only to the extent that [Universal] is hired by [Shleppers]." *Id.* In other words, should Shleppers terminate its contract with Universal, Plaintiffs would no longer perform work for Shleppers. Shleppers' CEO testified that his interactions were limited to Universal's owner, and that should he terminate a subcontractor, he was terminating the entity, not its individual employees. Itzhaki Dep. Tr. 1 at 66:25–68:22. Moreover, Plaintiffs' testimonies indicate no interaction with Shleppers' CEO and other supervisors involved in Shleppers' hiring and retention. To the contrary, Shleppers CEO appeared wholly uninterested in who Plaintiffs were, how they were disciplined, and how they were paid. *See* Itzhaki Dep. Tr. 1 at 67:19–68:22; Itzhaki Dep. 2 at 73:5–74:2. Thus, the record does not suggest that Shleppers would have retained Plaintiffs' services absent a contract with Universal. This factor weighs in Shleppers' favor.

### v.   Supervision

The fifth factor concerns the degree to which Shleppers supervised Plaintiffs' work. *Zheng* has cautioned that "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement." 355 F.3d at 75. It appears to the Court beyond dispute that Shleppers exercised substantial supervision over Plaintiffs' work. Not only did Shleppers exclusively dictate, through the Bill of Lading, when and what services would be performed, SMF ¶¶ 6–8, 10, Shleppers also set conduct guidelines governing what Plaintiffs could say and how they

could act. Agreement at 3. Moreover, any additional services or changes to the job were directed by Shleppers' dispatch team. *Id.* ¶ 17; Itzhaki Dep. 1 at 63:4–65:11. Shleppers supervisors would also check in on how Plaintiffs were packing items and, if necessary, direct Plaintiffs to correct arrangements. Montachana Dep. at 42:9–21.

Nonetheless, "[t]aking measures to ensure quality control does not prove control over conditions of employment." *Hugee v. SJC Grp., Inc.*, No. 13-CV-423 (GBD), 2013 WL 4399226, at *6 (S.D.N.Y. Aug. 14, 2013) (internal citation omitted). In the moving services industry, timeliness, professional conduct, and proper packing ensure quality service, which Shleppers may reasonably oversee without becoming a joint employer. *See Jean-Louis*, 838 F. Supp. 2d at 135. Accordingly, while this factor weighs in favor of Plaintiffs, it is not dispositive.

### vi. Exclusivity

For the final *Zheng* factor, the Court is to consider whether Plaintiffs worked exclusively or predominantly for Shleppers. At least two Plaintiffs testified that they worked exclusively for Shleppers. Montachana Dep. 42:2–4; Izalde Dep. at 55:8–10. Plaintiff Nereo, who worked on the same team as those other Plaintiffs, *see* Montachana Dep. at 21:6–9, more likely than not also worked predominantly for Shleppers. This factor weighs in Plaintiffs' favor.

### vii. Other Factors

The Court "is also free to consider any other factors it deems relevant to its assessment of the economic realities." *Zheng*, 355 F.3d at 71–72. Plaintiff contends that several additional factors are relevant. P. Mot. at 17–18. These include the facts that: Shleppers created the impression to customers that Plaintiffs were their employees by requiring the use of Shleppers' uniforms and logos; Shleppers appeared to know Plaintiffs were underpaid; Shleppers failed to ensure that Plaintiffs complied with federal regulations; Shleppers required Universal to make them a certificate holder on Universal's workers' compensation insurance policies; and Shleppers required Universal to name Shleppers as additional insured parties on its automobile policies. *Id.*

The Court disagrees that these facts are relevant to the joint employment inquiry. Each of these facts bear on Shleppers' knowledge, intent, or wrongdoing. However, the joint employment inquiry is concerned with "economic realities" and the control exercised by putative employers over plaintiff employees. *See Zheng*, 355 F.3d at 68–69. None of the facts highlighted by Plaintiffs here evidence of further control by Shleppers, except the requirement regarding use of Shleppers' uniforms and logos, which has already been discussed. *See supra*, Discussion Sections I(A)(1)(ii); I(A)(2)(i). If anything, Shleppers' failure to ensure that Plaintiffs complied with federal regulations indicates a lack of employer control, particularly because Shleppers maintained compliance records for their in-house employees. *See* Itzhaki Dep. 2 at 75:3–76:7.

### 3. Totality of the Circumstances

Just as the *Carter* analysis for formal control was inconclusive, so too is the *Zheng* analysis for functional control. The factors of supervision and exclusivity weigh in favor of Plaintiffs, while the factor of fungibility weighs in favor of Shleppers. The factor of premises and equipment weighs somewhat in Plaintiffs' favor, while the remaining factors are either inconclusive or of limited relevance. Although the overall weight of the evidence appears to lean toward a conclusion that Shleppers was a joint employer, the fact-intensive nature of this inquiry and the rare instances of the Circuit settling this fact-intensive inquiry at this stage cautions the Court against summary judgment. *See Hart v. Rick's Cabaret Int'l, Inc*., 967 F. Supp. 2d 901, 941 (S.D.N.Y. 2013). Moreover, the Court finds that there are genuine issues of material fact that a jury must determine with respect to several factors, including the extent of Shleppers' control over Plaintiffs' pay rates, whether Plaintiffs could shift from employer to employer as a unit, and whether supervision of Plaintiffs crossed the line from quality control to employee control. Accordingly, the Court will not determine Shleppers' joint employer status as a matter of law.

### B. Single Integrated Enterprise

Multiple corporate entities may be held liable as a single "employer" under a "single integrated enterprise" theory. *Huer Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580, 586 (S.D.N.Y. 2020). "Where the single-integrated-enterprise theory applies, courts may impose liability for a violation not only on the nominal employer but also on another entity comprising part of the singe integrated employer." *Id.* (cleaned up) (citing *Arculeo v. On-Site Sales & Mktg.*, LLC, 425 F.3d 193, 198 (2d Cir. 2005)).

Whether a group of entities qualifies as a single integrated enterprise turns on four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 133 (S.D.N.Y. 2020) (citing *Brown v. Daikin America, Inc.*, 756 F.3d 219, 226 (2d Cir. 2014)). No one factor is dispositive. *Id.* Moreover, liability under a single integrated enterprise theory is usually an "extraordinary circumstance[]" requiring plaintiffs to demonstrate "sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer." *Hart*, 967 F. Supp. 2d at 940 (internal citation omitted).

Shleppers has demonstrated, as a matter of law, that it did not operate as a single integrated enterprise with Universal. First, on interrelated operations, courts consider, among other facts, whether entities "share employees, services, records, and equipment and whether the entities commingle bank accounts, inventories, and lines of credit." *Dobrosmylov v. DeSales Media Grp., Inc.*, 532 F. Supp. 3d 54, 62 (E.D.N.Y. 2021) (internal citations and quotation marks omitted). There is no evidence that Shleppers and Universal commingled bank accounts, inventories, and lines of credit, or shared records. To the extent that Shleppers and Universal shared employees and services, that is better approached as a question of joint employment, given that Universal has subcontracted with Shleppers to provide the services of its employees. *See Zheng*, 355 F.3d at 75–76 (emphasizing

that the functional and formal control tests for joint employment are meant to ensure that the FLSA

does not "subsume typical outsourcing relationships"). For this same reason, the second factor on

centralized control of labor relations should be analyzed as a joint employment inquiry under *Zheng*,

which the Court has already determined is inconclusive. And Plaintiffs have offered no evidence

showing the third and fourth factors—that Shleppers and Universal shared common management and

common ownership or financial control.

Viewing the evidence in the light most favorable to Plaintiffs, the weight of the four factors is

against finding the existence of a single integrated enterprise. As a matter of law, Shleppers'

relationship with Universal does not warrant the application of this "extraordinary circumstance."

*Hart*, 967 F. Supp. 2d at 940.

## II.    As a Matter of Law, Plaintiffs Were Not Paid Adequate Wages

Shleppers denies involvement with Plaintiffs' hours and wages and does not deny or affirm

Plaintiffs' statements about the hours they worked and the pay that they received. ECF No. 87 at 9.

Shleppers also kept no records of Plaintiffs' hours or wages. Itzhaki Dep. 2 at 73:24–74:2; Izalde Aff.

¶ 9; Nereo Aff. ¶ 9; Montachana Aff. ¶ 9.

When a purported employer fails to keep records of his employees' hours and wages, the

employee meets his burden of proof if he shows "that he has in fact performed work for which he

was improperly compensated and if he produces sufficient evidence to show the amount and extent

of that work as a matter of just and reasonable inference." *Grochowski v. Phoenix Const.*, 318 F.3d

80, 87–88 (2d Cir. 2003) (internal citation omitted). Plaintiffs' affidavits and testimony regarding the

number of hours they worked on average and their approximate wages are sufficient evidence for the

Court to conclude that their hours and wages did not meet minimum wage and overtime standards.

Plaintiffs' employer is accordingly liable under the FLSA and NYLL for minimum wage and

overtime wage violations as a matter of law. For the avoidance of doubt, Shleppers will only be liable

for these claims if a jury determines that it is a joint employee of Plaintiffs.

19

III.    **Plaintiffs Appear to Lack Standing to Proceed on Wage Notice and Statements Claims**

The Wage Theft Prevention Act of the NYLL requires that employers provide each employee with annual wage notices and accurate wage statements each time wages are paid. *See* N.Y. LAB. LAW §§ 195(1)(a) and (3) (McKinney 2024). An employer is required to "provide his or her employees, in writing in English and in the language identified by each employee as the primary language of such employee . . . a notice containing . . . the rate or rates of pay thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other . . . allowances." *Id.* § 195(1)(a). Employers are also required to "furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof . . . allowances, if any, claimed as part of the minimum wage . . . and net wages." *Id.* § 195(3).

However, to have standing to maintain a wage notice or wage statement claim under the NYLL, a plaintiff must allege that he suffered "downstream consequences resulting from the failure to receive [that] information." *Pinzon v. 467 Star Deli Inc.*, No. 22-CV-6864 (JGK) (SLC), 2023 WL 5337617, at *11 (S.D.N.Y. July 31, 2023), *report and recommendation adopted*, No. 22-CV-6864 (JGK), 2023 WL 5334757 (S.D.N.Y. Aug. 18, 2023) (internal quotation marks and citation omitted). An "informational injury" itself is insufficient to establish standing. *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 307 (2d Cir. 2024). Instead, a plaintiff may successfully establish standing by "plausibly show[ing] that defective notices led him or her to loses wages . . . ." *Id.* at 310. For example, a plaintiff who argues that inadequate wage statements or notices deprived them of the opportunity to advocate for pay must show that "he or she would have undertaken such advocacy and plausibly would have avoided some actual harm[]." *Id.* at 308. Speculation and conjecture are insufficient to establish standing. *Id.* at 309.

Plaintiffs allege that Shleppers failed to provide adequate wage statements and wage notices, and Shleppers does not deny this to be true. ECF No. 87 at 9. However, Plaintiffs offer no evidence

to show what Plaintiffs would have done differently to obtain higher wages had they been provided wage statements and wage notices. Plaintiffs fail to put forth any other argument for standing in their briefing. Plaintiffs are granted an opportunity to submit a brief, with supporting evidence, on why wage notice and statements claims should not be dismissed for lack of standing.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED, except that the Court finds, as a matter of law, that Plaintiffs were not paid adequate wages under the FLSA and NYLL overtime and minimum wage provisions. Defendants' motion for summary judgment is DENIED. Plaintiffs may submit briefing with supporting evidence on why wage notice and statements claims should not be dismissing for lack of standing by **May 1, 2025**. Defendants have until **May 15, 2025** to respond. By **April 15, 2025**, the parties shall file a joint letter with proposed trial dates for July, August, or September and the letter shall include whether parties are interested in a referral to the Mediation Program or for a settlement conference.

Dated:  March 27, 2025
      New York, New York

SO ORDERED.

Jessica Clarke

JESSICA G. L. CLARKE
United States District Judge